URSULA TREADAWAY,         )
                               )
      Plaintiff          )
                               )     Case No. 1:07-CV-298
v.                          )
                               )     Chief Judge Curtis L. Collier
BIG RED POWERSPORTS, LLC, d.b.a.   )
SOUTHERN HONDA POWERSPORTS,   )
                               )
      Defendant.       )

## <u>MEMORANDUM</u>

Before the Court is a motion for summary judgment filed by Defendant Big Red Powersports, LLC, d.b.a. Southern Honda Powersports ("Defendant") (Court File No. 19). Defendant has filed a memorandum of law supporting its motion for summary judgment (Court File No. 22) along with supporting exhibits and affidavits. Plaintiff Ursula Treadaway ("Plaintiff"), after receiving an extension of time, filed her response (Court File No. 25) and Defendant timely filed a reply (Court File No. 27). After considering these filings and the supporting evidence, and for the reasons explained below, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.

## I.    RELEVANT FACTS

Defendant assembles and sells all-terrain vehicles, motorcycles, and related accessories at its facility in Chattanooga, Tennessee. Starting in September 2004, it employed Plaintiff first as a receptionist, then as a finance specialist, until Plaintiff's employment ended. Plaintiff moved to Defendant's newly-built facility in May 2006, along with other sales and finance staff, and worked in a cubicle near the showroom floor (Treadaway Aff. ¶ 2).

Power vehicles, like those Defendant sells, emit carbon monoxide ("CO")[1] as a byproduct of their internal combustion engines. At Defendant's facility, CO emissions occurred during engine testing in the vehicle assembly area, as well as when sales personnel or customers started vehicles in the showroom as part of a demonstration. On May 17, 2006, shortly before Defendant moved into its new facility, an evaluation of indoor air quality issues conducted by ACS Services, Inc. found "hazardous fumes from assembly area infiltrating retail and office areas" and "assembly area ventilation and exhaust not meeting code requirements" (Griffith Dep. Ex. 3). It recommended "relocat[ing the] existing assembly area so as to separate from retail and office areas" and "install[ing] proper ventilation and exhaust" (*id.*).

The parties disagree about whether Defendant adequately addressed these issues. Defendant maintains it put safeguards in place to protect Plaintiff and others from CO exposure. Plaintiff, however, maintains Defendant took no permanent or remedial measures to eliminate the CO problem, even after other employees had complained about noxious fumes and after CO alarms had gone off in the facility. Despite believing CO problems persisted, Plaintiff continued her work at the facility.

In August 2006, Plaintiff discovered she was pregnant (Treadaway Dep. Ex. 3). She was examined by an OB/GYN specialist on August 18, 2006, and maintains the physician informed her of the danger CO fumes posed to her unborn child (*id.*; Treadaway Aff. ¶ 12). She revisited this physician on August 22, 2006, and obtained a note reading: "Due to constant exposure to carbon monoxide we due [sic] not feel it is in patient's best interest to be at work until problem is corrected"

---

[1]Transcripts of deposition testimony incorrectly refer to the substance at issue as $CO_2$. This is actually carbon dioxide, the harmless byproduct of respiration. The chemical formula for the more noxious substance, carbon monoxide, is CO and is used throughout this Memorandum.

2

(Treadaway Dep. Ex. 14). The note recommended Plaintiff be released from work from August 22 "until further notice" (*id.*).

Based on this recommendation, Plaintiff went to work that day to discuss the situation. She first attempted to speak to her immediate supervisor, Dava Griffith, but Griffith was apparently not at work that day (Treadaway Dep. 208). Instead, Plaintiff spoke with Jim Hall, Defendant's Chief Financial Officer (*id.* at 208, 228–29).[2] Plaintiff says she informed Hall she would need to take leave until the environment was corrected to ensure the safety of her fetus, says she informed him of her supporting documentation, and says she attempted to give the note to him (Treadaway Dep. 275, 362–63). However, Plaintiff contends, Hall maintained he did not need the documentation and gave it back to Plaintiff (Treadaway Dep. 242, 244; Griffith Dep. 79; Treadaway Aff. ¶ 17). Lastly, Plaintiff says Hall informed Plaintiff she should take leave and he would contact her when he had determined how to address the problem (Treadaway Dep. 241; Griffith Dep. 131–32).

Not surprisingly, Defendant disputes Plaintiff's account of the August 22 events. Additionally, Defendant points out that shortly after the August 22 conversation, on August 31, Plaintiff filed for unemployment benefits with the state (Treadaway Dep. Ex. 26).

Plaintiff maintains that in the weeks following her August 22 conversation with Hall, she attempted to contact both Griffith and Hall to get an update on her situation, and to check on whether additional CO safeguards had been installed, but got no response (Court File No. 25, at 6). She sent an email to Griffith on October 9, 2006, checking on her job position, but again received no response (Griffith Dep. 107–12 & Ex. 12). In the email, Plaintiff asked if Griffith was still holding her job

_____

[2]Plaintiff maintains Hall was responsible for Defendant's FMLA functions, though Defendant disputes this.

open, which Griffith considered "a very bizarre thing for her to ask" (Griffith Dep. 110), because Griffith increased the hours of other workers to compensate for Plaintiff's extended absence (*id.* at 107).

Plaintiff's physician cleared her to resume work on November 1, 2006 (Treadaway Dep. 281, 284 & Ex. 24). Plaintiff alleges she made several more calls to Defendant's personnel over the next few months, but never received a response (Court File No. 25, at 7). Finally, on January 3, 2007, Plaintiff went to Defendant's facility to meet with Griffith; Griffith told her she had been replaced and was no longer needed, and handed her a separation notice (Treadaway Dep. 287; Griffith Dep. 122 & Ex. 14). The separation notice read that Plaintiff was employed until August 31, 2006, and she quit on that date because of voluntary maternity leave (Griffith Dep. Ex. 14). Plaintiff expressed to Defendant her disagreement with the "voluntary" characterization of her separation (Treadaway Dep. 294).

Plaintiff filed suit in November 2007 in Hamilton County, Tennessee, Chancery Court, alleging violations of the federal Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304; common law retaliation policies for "whistleblowing"; and the Tennessee Maternity and Adoption Care Leave Act, Tenn. Code Ann. § 4-21-408 ("TMLA") (Court File No. 1 Ex. 1 (complaint)). Defendant removed the action to this Court on December 19, 2007 (Court File No. 1). Defendant now moves for summary judgment on each of Plaintiff's claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). That is, the moving party must provide the grounds upon which it seeks summary judgment, but does not need to provide affidavits or other materials to negate the non-moving party's claims. *Celotex*, 477 U.S. at 323. The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, and must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

The Court will first address Plaintiff's FMLA claim, then turn to her TMLA claim, and end by addressing her common law and statutory whistleblowing claims.

### A. Federal FMLA Claim

5

The Family and Medical Leave Act ("FMLA") provides eligible employees with up to 12 weeks of leave per 12-month period when the employee suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A serious health condition is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11).

The Court of Appeals for the Sixth Circuit acknowledges two theories of recovery under the FMLA. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006). The "entitlement" or "interference" theory recognizes employers may not "interfere with, restrain, or deny the exercise or attempt to exercise any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). The "retaliation" or "discrimination" theory arises from the provision making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2). Here, Plaintiff's allegation she was impermissibly denied leave falls under the interference theory. Plaintiff does also allege she was "terminated because of her complaints about the carbon monoxide fumes in her workplace and her refusal to work in that environment" (Compl. ¶ 15). However, both parties have briefed that issue as a part of Plaintiff's "whistleblower" claims, while their focus for FMLA purposes has been exclusively on the allegedly wrongful denial of leave under an interference theory. The Court, then, will focus on this theory in evaluating the motion for summary judgment.

To succeed on an FMLA interference claim, a plaintiff must demonstrate:

(1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.

6

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). In this case, the parties do not dispute the first two elements. The Court, therefore, must decide whether Plaintiff's evidence has created a genuine issue of fact as to each of the last three elements, such that summary judgment on the FMLA claim would be inappropriate. The Court will examine each factor in turn.

### 1. Was Plaintiff entitled to leave under the FMLA?

In moving for summary judgment, Defendant argues Plaintiff's own evidence never establishes she was incapacitated for any period, a critical component of entitlement to leave under the FMLA (Court File No. 22, at 9–10). Plaintiff counters there is a great deal of evidence showing the environment in which she worked was constantly exposed to CO fumes, and Defendant never corrected this problem, such that she was incapacitated out of concern for her fetus (Court File No. 25, at 11–15).

Recall that the FMLA provides for leave if an eligible employee has a "serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). A serious health condition is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). Here, there is no allegation Plaintiff spent time as an inpatient due to her condition, so the Court evaluates her claim under the "continuing treatment" prong.

The FMLA's implementing regulations further define the latter prong: "A serious health condition involving continuing treatment by a health care provider includes . . . [p]regnancy or prenatal care. Any period of incapacity due to pregnancy, or for prenatal care." 29 C.F.R. §

825.115(b); *see also id.* § 825.120(a)(4) ("The mother is entitled to FMLA leave for incapacity due to pregnancy, for prenatal care, or for her own serious health condition following the birth of the child. . . . An expectant mother may take FMLA leave before the birth of the child for prenatal care or if her condition makes her unable to work.").[3] "Incapacity" refers to an employee's inability to perform the essential functions of the job. *See Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.*, 180 F. Supp. 2d 922, 933 (W.D. Mich. 2001); 29 C.F.R. § 825.113(b) ("The term 'incapacity' means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."). The question for the Court is whether Plaintiff can show she was incapacitated as a matter of law by virtue of being restricted from performing an essential function of her job because she was pregnant. The Court's task is complicated somewhat by the circularity of the legal definitions: a serious health condition is defined in terms of the employee's incapacity, while her incapacity refers to her inability to work due to her serious health condition.

Defendant introduces evidence which, it claims, casts doubt on Plaintiff's claim the CO caused her to become so concerned for her baby she had to quit her job. Defendant points to Plaintiff's testimony that "[t]he restriction was the environment, not my disability" (Treadaway Dep. 323) and her statement her "pregnancy wasn't the problem. It was the carbon monoxide fumes . . . that was the problem" (*id.* at 281) as evidence Plaintiff did not become incapacitated due to her pregnancy. Lastly, Defendant points out Plaintiff's testimony she only worked in the facility for a

---

[3]Both parties cite to 29 C.F.R. § 825.114(a)(2)(ii). However, the FMLA's implementing regulations were reorganized effective January 16, 2009, *see* The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67,934, 68,073 (Nov. 17, 2008), and the applicable regulation covering FMLA leave for pregnancy is now found at 29 C.F.R. § 825.120(a)(4). As a result, the Court has used the latter citation throughout this Memorandum.

few days after her pregnancy began, during which she did not feel any nausea or symptoms of morning sickness (*id.* at 51–53, 254–55, 300 & Exs. 3, 5). Defendant argues these "admissions" by Plaintiff demonstrate she never experienced a period of incapacity related to her pregnancy when she stopped coming to work in August 2006 (Court File No. 22, at 9–10).

Plaintiff, however, presents a competing account. She points to her trip to her OB/GYN specialist on August 22, and the note she secured from the specialist, as evidence of an incapacity due to the combination of CO fumes, lack of safeguards, and her pregnancy (Treadaway Dep. 208, 228–31, 238, 275 & Ex. 14). Admittedly, the note does not say Plaintiff absolutely could not return to work, but only that it was not in her best interest to work until the CO situation was resolved. However, on summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party, *Matsushita*, 485 U.S. at 587, and in this case, there is a reasonable inference that Plaintiff's physician concluded the CO situation precluded Plaintiff from working, in light of her pregnancy. This is an incapacity within the definition used in the implementing regulations, and Plaintiff has at least created a genuine issue regarding it which a trier of fact should determine.

The parties also have an extensive dispute regarding the use of CO safeguards and alarm systems. Defendant maintains that while Plaintiff was working at the facility, safeguards were already in place to protect her and other employees from CO exposure (Treadaway Dep. 361; Griffith Dep. 24, 72–73; Hall Aff. ¶ 5). Defendant also points out that Plaintiff herself never heard any CO alarms go off inside the facility (Treadaway Dep. 361), but was only told by co-workers of one event, which occurred on a weekend, when the alarms went off. Defendant also points to Plaintiff's admission Defendant tried to resolve her concerns by placing CO monitors outside her

9

cubicle after she had left in August (*id.* at 281, 313).

Plaintiff, on the other hand, directly counters Defendant's assertion that it attempted to allay her concerns. She testified Defendant took no permanent remedial measure to eliminate the presence of CO (*id.* at 243; Treadaway Aff. ¶ 5), even after the May 17 evaluation which found hazardous fumes "infiltrating" the retail and office areas (Griffith Dep. 27–28 & Ex. 3). Though Plaintiff herself may not have heard a CO alarm sound while she was working in the facility, she did find out about a CO alarm going off, and heard from other employees they had complained about CO (Treadaway Dep. 210–12, 215–16, 218–19, 288, 361; Griffith Dep. 74–75; Treadaway Aff. ¶ 7). Moreover, Plaintiff contends Defendant did not attempt to improve the environment around Plaintiff's cubicle following Plaintiff's leaving work in August, and that Hall never informed her even if he had taken improvement measures (Treadaway Dep. 247).

Plaintiff contends she experienced symptoms which could be consistent with CO exposure during her employment, most significantly nausea and lightheadedness. She describes nausea and vomiting around the time of her August 18 visit to her physician, though she indicates this could also be morning sickness resulting from her pregnancy (*id.* at 51–53). Elsewhere in her deposition, she describes discussing her lightheadedness and nausea with her physician, but knew those symptoms could "overlap" with or "be masking the symptoms of" her pregnancy, and not just result from CO poisoning (*id.* at 254–55). It is thus unclear whether Plaintiff's physical symptoms resulted from CO exposure or from her pregnancy or both, and Defendant points to this ambiguity as evidence Plaintiff could not have been incapacitated from the CO after she found out she was pregnant (Court File No. 22, 5). The Court takes a contrary view, however: this lack of clarity creates a genuine issue of fact regarding whether Plaintiff was rendered incapacitated from performing essential

10

functions of her job. A reasonable jury could conclude any incapacitation was caused exclusively by the CO, or was merely the result of morning sickness from her pregnancy, or was a combination of both. Note, too, that even if Plaintiff's symptoms resulted only from her morning sickness, this could also be a serious health condition which rendered Plaintiff incapacitated. *See* 29 C.F.R. § 825.120(a)(4) ("The mother is entitled to leave for incapacity due to pregnancy even though she does not receive treatment from a health care provider during the absence . . . . For example, a pregnant employee may be unable to report to work because of severe morning sickness.").

In the Court's view, the above evidence proffered by both sides indicates a fundamental factual dispute regarding whether CO safeguards were in place, and whether Plaintiff experienced CO poisoning from inadequate safeguards. If Defendant did institute adequate safeguards, or if Plaintiff is unbelievable as to the alleged cause of her symptoms, Plaintiff's argument she was incapacitated from working is weakened. If the opposite is true, Plaintiff's argument she was incapacitated and hence entitled to FMLA leave is bolstered. In this regard, this evidentiary dispute concerns a fact material to an element of Plaintiff's FMLA claim. The choice of which of these accounts to believe, however, is the province of the finder of fact at trial, not the Court at summary judgment.

Both parties cite extensively to *Whitaker v. Bosch Braking Systems Division of Robert Bosch Corp.*, 180 F. Supp. 2d 922 (W.D. Mich. 2001), to support their arguments regarding whether Plaintiff was entitled to FMLA leave. In *Whitaker*, the plaintiff was a factory worker who became pregnant. She requested FMLA leave from working overtime so she could work forty hours a week, and presented a signed doctor's note indicating this restriction was necessary for the plaintiff's health. *Id.* at 924–25. After the defendant denied the plaintiff's request, she sued for the difference

11

in wages between what she would have earned working forty hours a week, and what she earned on the short term disability leave she was forced to take. *Id.* at 925.

In considering the "serious health condition" issue, the *Whitaker* court determined that pregnancy, by itself, is not a serious health condition—rather, the pregnancy must produce a period of incapacity, or the employee must seek prenatal care. *Id.* at 928 (citing the former 29 C.F.R. § 825.114(a)(2)(ii)). The court went on to conclude the plaintiff *had* established incapacity because the restrictions imposed on her by her doctor prevented her from working. *Id.* at 931. As the court pointed out, "nothing in the FMLA provides that a pregnancy can constitute a serious health condition only if the pregnancy is abnormal or if the employee is physically unable to perform her job. . . . Plaintiff may have been physically able to perform her job, but she was prevented from doing so by [her doctor's] restriction." *Id.* The court found the plaintiff had established a serious medical condition, and after considering the other elements of the plaintiff's FMLA claim, awarded summary judgment in the plaintiff's favor.

This Court finds, for summary judgment purposes only, that *Whitaker* bears important factual and legal similarities to Plaintiff's case. Both pregnant plaintiffs demonstrated (or at least, in the instant case, attempted to demonstrate) evidence from their treating physicians that because of the conditions of their workplace, a restriction on their work duties was necessary. Construing the instant Plaintiff's note in the light most favorable to her, Plaintiff's OB/GYN specialist forbade her from working at Defendant's facility until it resolved the CO issues of which Plaintiff had complained. Such a conclusion is supported by the note from Plaintiff's physician allowing her to "return to work as of 11/1/06 without restrictions" (Treadaway Dep. Ex. 24). Here, as in *Whitaker*, Plaintiff would not be entitled to leave based solely on the fact she was pregnant. However, she has

12

introduced sufficient evidence from which a jury could conclude it was a combination of factors—her pregnancy, the symptoms she suffered from CO exposure, and Defendant's alleged failure to remedy the problem—which rendered her unable to work. As such, summary judgment on this element would be inappropriate.

Lastly, the Court has considered Defendant's arguments raised in its reply memorandum, but has found them unpersuasive. Defendant repeats its argument, pointing to Plaintiff's deposition, that it took adequate precautions to protect Plaintiff from CO exposure, and asserts it is "undisputed" it took such measures (Court File No. 26, at 3). Yet Plaintiff *does* dispute whether Defendant took such precautions (Treadaway Dep. 243; Treadaway Aff. ¶ 12), and the evidence in the record suggests even if Defendant did implement precautionary measures, it did so only after learning of Plaintiff's pregnancy. The Court must focus on whether the CO situation led to Plaintiff's incapacity when she was a few weeks pregnant and saw her physician regarding the CO issue on August 22, before Defendant ever learned of her pregnancy. Relatedly, though Defendant argues "even Plaintiff's physician considered [Defendant's setting up additional CO monitors outside Plaintiff's cubicle] sufficient to eliminate the need for her work restriction" (Court File No. 26, at 3), the evidence viewed in the light most favorable to Plaintiff shows the monitors were not installed until well after her pregnancy, and Defendant did not inform Plaintiff it had installed the monitors at all, such that Plaintiff's physician could not issue her an earlier authorization to return to work (Treadaway Dep. 281, 284).

Defendant also points out that Plaintiff applied for unemployment benefits on August 31, 2006, rather than physically entering Defendant's facility to discuss the possibility of her returning to work (Court File No. 26, at 4). True, these facts may cut against Plaintiff. On the other hand,

13

Plaintiff may be able to offer an explanation for why she applied for unemployment benefits soon after leaving the job. Which of those explanations to believe, though, is a credibility question that must be resolved by the jury, not the Court. Finally, Defendant presents a list of evidence which, it claims, shows that "constantly working around carbon monoxide" was not an essential function of Plaintiff's job (Court File No. 26, at 5–6). But this misconstrues the inquiry. As the Court explained above, the Court must determine whether Plaintiff can submit evidence showing she was incapacitated not only by the CO, but also by its effects on her as a pregnant woman concerned about the health of her fetus, and by Defendant's alleged failure to adequately remedy the harm. Under 29 C.F.R. § 825.120(a)(4), Plaintiff can claim incapacity due to pregnancy because she was suffering from nausea and lightheadedness, and the *jury* can choose to believe whether those symptoms occured from CO poisoning or morning sickness, and resulted in an inability for her to perform the essential functions of her job. At this point, Plaintiff has shown a genuine issue of material fact regarding the cause of her incapacity, and a jury should be allowed to decide that question.

For the foregoing reasons, the Court will not grant summary judgment on this element of Plaintiff's FMLA claim.

> **2.     Did Plaintiff adequately notify Defendant of her intention to take leave?**

Defendant next argues Plaintiff did not give notice she was taking FMLA leave for a qualifying reason (Court File No. 22, at 11–13). Plaintiff responds that her request for time off afforded Defendant adequate notice under the circumstances (Court File No. 25, at 15–19).

While an employee must provide notice and a qualifying reason for requesting leave, she need not actually mention the FMLA by name. *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th

Cir. 1998).  Instead, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."  *Id.* (internal quotation omitted).  The employee must provide the employer "enough information for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D)] has occurred."  *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999); *accord* 29 C.F.R. § 825.303(b).  "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case."  *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 724 (6th Cir. 2003).

The employer may require proper certification issued by a health care provider.  *See* 29 U.S.C. § 2613.  If an employee's request is unclear, the employer must inquire further to obtain the necessary details of the requested leave to determine whether it qualifies as FMLA leave.  *See* 29 C.F.R. § 825.303(b).

In *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005), the plaintiff suffered a knee injury and obtained a doctor's note instructing him to remain off work, but did not request leave or obtain leave of absence forms from his employer's medical department.  After his doctor's appointment, he did not return to work or contact anyone at his employer to inform them of his status.  Furthermore, he did not inform his immediate supervisor of his doctor's admonition to stay off work; rather, he told the security department (which was responsible for recording employees' hours) he would not return to work for a few days because he was "sick."  *Id.* at 482–83.  His employee handbook "recited the proper procedures for requesting FMLA leave and it specifically stated, 'Do not request FMLA through security.'"  The plaintiff had taken medical leave in the past, and thus was aware of his employer's FMLA policy.  *Id.* at 484.

15

The Sixth Circuit, in analyzing the notice prong on appeal of summary judgment in favor of the defendant, held the plaintiff did not adequately notify his employer he was taking FMLA leave. While the plaintiff's employer could not terminate him merely for failing to comply with company policy regarding which department he should notify, the plaintiff's conduct went further than that; he did not indicate he needed time off and never requested FMLA certification forms. *Id.* at 486. He did not attempt to contact his immediate supervisor, his employer's labor relations department, or the medical department for several days after his doctor's recommendation. *Id.* He also conceded during discovery that he notified the wrong department, as he knew the security department could not grant him a leave of absence. *Id.* at 487. Accordingly, the Sixth Circuit upheld summary judgment in the defendant's favor.

The facts of the instant case, viewed in the light most favorable to Plaintiff, differ significantly from those in *Walton*. While Walton never attempted to contact his supervisor or others with control over FMLA leave decisions, Plaintiff here told Hall she was pregnant and concerned about the effects of CO on her unborn child, as at least one of Defendant's employees concedes (Griffith Dep. 83). Plaintiff contends she told Hall she would need leave until Defendant took adequate safety measures (Treadaway Dep. 275, 314). Plaintiff informed Hall she had documentation from her physician supporting her need for leave, but Hall rebuffed her attempt to hand it to him. In so doing, Hall not only took action that distinguished these circumstances from Walton's (who did not attempt to submit documentation until nearly two weeks after he was terminated, 424 F.3d at 486), but also did not fulfill his obligation to inquire further of Plaintiff's request if he considered it unclear. *See* 29 C.F.R. § 825.303(b). In other words, according to Plaintiff's account, she attempted to give more detail to her employer about her condition beyond

16

saying she was merely "sick" (as Walton did), but was prohibited from doing so by her employer's refusal to accept her documentation.

There is also a genuine issue of fact concerning how much guidance Plaintiff had vis-à-vis Defendant's FMLA policies (unlike Walton, whose employee handbook explicitly spelled out the procedures for requesting FMLA leave). Defendant's employee handbook, "Working Together at Big Red Powersports, LLC," contains a section entitled "Personal Leave" which states:

> On occasion, it may become necessary for you to request a Personal Leave for extended periods of absence resulting from injury, illness, maternity, military duty, or for other personal reasons. If you find it necessary to apply for such a leave, you should contact your supervisor well in advance in order to obtain the details of your obligations. Personal leaves are without pay, but may, depending upon their nature, retain other rights and benefit plan participation privileges. In addition, under certain circumstances, employees may be eligible for unpaid leave as specified by law under the Family and Medical Leave Act (FMLA). See your supervisor or the Office Manager for details of FMLA policies.

(Griffith Dep. Ex. 4). At least based on the evidence Defendant has submitted to the Court, there are no other sections of "Working Together" which deal with Defendant's FMLA policies. Plaintiff acknowledged receiving the employee handbook when she started working for Defendant (Treadaway Dep. Ex. 13) but maintains Defendant never trained her in or talked to her about its FMLA policy (*id.* at 367), and that the handbook does not adequately explain the details of that policy (Court File No. 25, at 16).

FMLA-covered employers who give written guidance to employees concerning their leave rights must provide "information concerning FMLA entitlements and employee obligations." *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 550 (6th Cir. 2008) (quoting 29 C.F.R. § 825.301(a)(1)). The notice must provide, in detail, "the specific expectations and obligations of the employee and explain[] any consequences of a failure to meet these obligations." *Id.* (quoting 29

C.F.R. § 825.301(b)(1)(v)). Here, the extent of the handbook's coverage of Defendant's FMLA policy is to advise employees they may be eligible for leave under the FMLA, and to advise them to inquire of their supervisors for further details; the handbook provides no further details. Relevantly for this case, the handbook does not describe who would be an eligible supervisor (only an employee's immediate supervisor, or would a higher-up with knowledge of Defendant's FMLA policy count?); the circumstances under which employees would be eligible for leave; or the specificity with which an employee would have to describe her medical condition to qualify for FMLA leave. On August 22, Plaintiff tried first to contact her supervisor, Griffith, as required by the last sentence of the Personal Leave paragraph, but Griffith was not at work that day (Treadaway Dep. 208). Plaintiff then went to Griffith's superior, Hall, who she believed had control over Defendant's FMLA functions in light of Hall's close working relationship with Defendant's human resources department (Griffith Dep. 16–17, 38). The following exchange also indicates how such a belief could arise:

> Q.      Who's in charge of monitoring and keeping up with FMLA times and absences?
>
> A.      Human resources department.
>
> Q.      Okay. Which is under Mr. Hall; correct?
>
> A.      Under the way things were then, yes.

(*id.* at 106).

Even if Plaintiff turned out ultimately to be wrong about the role Hall played in Defendant's FMLA policies—and Griffith seems to contend she was (*id.* at 104–06)—because she was bereft of guidance from her employee handbook, it would be little wonder if Plaintiff did not follow Defendant's FMLA policy to the letter.

18

In reply, Defendant argues Hall was not, in fact, in charge of FMLA leave, and that the employee handbook directs all FMLA issues to the employee's supervisor or to the office manager (Court File No. 26, at 10). Indeed, the employee handbook does so state; but as the Court discussed above, the handbook provides inadequate guidance about the proper procedures to use when an employee requests FMLA leave, including which supervisors exercise control over leave requests, and (most relevantly here) what to do if a particular supervisor is not available when an employee requests leave.[4] Additionally, because Plaintiff has introduced evidence from which a jury could conclude her immediate supervisor, Griffith, was not at work when Plaintiff requested leave, and that Hall had some measure of control over Defendant's FMLA function, there is a genuine issue of material fact precluding summary judgment.

In the words of supervisor Griffith, "we don't know what transpired between [Plaintiff] and Jim Hall that day" (Griffith Dep. 132). None of the participants in this matter seem to be sure of the specificity with which Plaintiff requested leave from Hall on August 22, 2006, and the Court is unwilling to guess at it. Because this is the case, any account of that conversation is subject to an evaluation of its believability—a task which falls to the finder of fact. Accordingly, there is a genuine issue regarding whether Plaintiff gave adequate notice she was taking FMLA leave, thus rendering summary judgment on this element inappropriate.

---

[4]The Court notes, without deciding the issue, that Hall may be considered a supervisor for FMLA purposes as a matter of law. One court has held the FMLA's requirements for employers extend "to all those who controlled in whole or in part [a plaintiff's] ability to take a leave of absence and return to her position." *Johnson v. A.P. Prods., Ltd.*, 934 F. Supp. 625, 629 (S.D.N.Y. 1996). Another court has held supervisors may be considered employers if they exercised some control of an employee's efforts to take FMLA leave. *Waters v. Baldwin County*, 936 F. Supp. 860 (S.D. Ala. 1996). Because the parties have not raised the issue, however, the Court takes no position on the reasonableness, as a matter of law, of Plaintiff's belief Hall was her supervisor for Defendant's FMLA function.

### 3. Did Defendant deny Plaintiff FMLA benefits?

In its memorandum supporting its motion for summary judgment, Defendant does not put this last prong at issue, focusing instead on the third and fourth prongs of the FMLA interference claim. Because Defendant has the burden to raise a genuine issue of material fact as to this element, and it has not, summary judgment is inappropriate.

Defendant, therefore, has not shown there is no genuine issue of material fact as to any of the elements of Plaintiff's claim. Accordingly, summary judgment is inappropriate, and the Court will deny Defendant's motion for summary judgment as to Plaintiff's FMLA claim.

### B. TMLA Claim

Defendant next moves for summary judgment on Plaintiff's claim under the TMLA, Tenn. Code Ann. § 4-21-408. The TMLA, by its plain language, does not apply to an employer "who employs fewer than one hundred (100) full-time employees on a permanent basis at the job site or location." *Id.* § 4-21-408(d). Plaintiff does not dispute Defendant has employed less than one hundred employees at all times relevant to this action (Griffith Aff. ¶¶ 7–8). Therefore, Plaintiff cannot prevail on this claim as a matter of law, and the Court will grant Defendant's motion for summary judgment on it.

### C. "Whistleblowing" Claim Under the Tennessee Public Protection Act and Common Law

Finally, Defendant moves for summary judgment on Plaintiff's statutory and common law whistleblower claims, arguing Plaintiff has not produced evidence of her participation in any protected activity which would constitute whistleblowing as a matter of law. Alternatively, Defendant moves for dismissal of the whistleblower claims on the grounds they were untimely filed (Court File No. 22, at 13–16). Plaintiff responds her concern about her unborn child motivated her

20

to take leave from Defendant's facility, which constitutes a protected activity, and she was terminated for engaging in this activity. Plaintiff also contends her whistleblower claims were timely filed (Court File No. 25, at 20–24).

To prevail on a whistleblower claim under the TPPA, a plaintiff must prove by a preponderance of the evidence:

> (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; [and] (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Hubrig v. Lockheed Martin Energy Sys., Inc.*, 1998 WL 240128, at *7 (Tenn. Ct. App. May 4, 1998).

For a common law whistleblower retaliatory-discharge claim, a plaintiff must prove:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged, (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reasons which violates a clear public policy evidence by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Crews v. Buckman Labs. Int'l, Inc.*, 79 S.W.3d 852, 862 (Tenn. 2002). The TPPA requires the plaintiff to show her whistleblowing was the sole, or "exclusive causal," reason for her termination, while at common law, the whistleblowing need only be a "substantial factor" in her termination. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002). But under both the TPPA and common law, the plaintiff must assert her whistleblowing activity serves a public purpose, not merely a private one. *Id.* at 537 n.4.

Examining the evidence here, even when viewed in the light most favorable to Plaintiff, the Court is unpersuaded she has adduced sufficient evidence of illegal activities to qualify as a

whistleblower. In her deposition, Plaintiff conceded her only purpose in discussing the CO issue with Defendant was to inform them about her *personal* concern for her fetus—not about her concern for the safety of others who worked in or patronized Defendant's facility (Treadaway Dep. 275). Even if her concerns turned out to be well-founded, she never went public with those concerns, further indicating to the Court her activity was intended for private benefit. Furthermore, as Defendant argues, expressing concern about a fetus' potential exposure to CO does not implicate an "illegal activity" within the meaning of the TPPA or common law. While Plaintiff argues that under Tennessee law, she was "compelled" to complain about a potentially dangerous environment (Court File No. 25, at 21), she cites no legal support for her proposition the Tennessee homicide and assault statutes could be used to prosecute her if her fetus suffered harm. Certainly the Court is unaware of these statutes being used in such a manner, and Plaintiff is speculating her fetus would definitely suffer harm which would justify the use of these statutes to prosecute her. The Court finds this argument unpersuasive.

Also, even if Plaintiff had a reasonable belief Tennessee workplace regulations had been violated as a result of the introduction of CO fumes, the mere act of reporting what one perceives as a potentially dangerous situation does not rise to the level of whistleblowing under Tennessee law. *See Bright v. MMS Knoxville, Inc.*, 2007 WL 2262018, at *5 (Tenn. Ct. App. Aug. 7, 2007). Finally, Plaintiff has introduced no evidence showing a causal connection between her discharge and her reporting of the CO problem, apparently leaving the Court to make that inference. However, because Plaintiff bears the burden of coming forward with evidence creating an issue of fact once Defendant has raised summary judgment, she has not met her obligation to show a critical element of a whistleblower claim under both statutory and common law.

Accordingly, the Court will grant summary judgment to Defendant on Plaintiff's statutory and common law whistleblower claims. Because it has granted summary judgment on the above grounds, the Court does not reach Defendant's argument for dismissal based on when these claims were filed.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's motion for summary judgment with respect to Plaintiff's claims under the Tennessee Public Protection Act, common law retaliation policies, and the Tennessee Maternity and Adoption Care Leave Act, and will **DISMISS** those claims. The Court will **DENY** Defendant's motion with respect to Plaintiff's claim under the federal Family and Medical Leave Act. That claim shall be allowed to proceed to trial.

An Order will enter.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**